J-S84007-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| SHAUN C. WARRICK | |
| Appellant | No. 6 EDA 2016 |

Appeal from the Judgment of Sentence August 20, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0004005-2011
CP-51-CR-0004006-2011

BEFORE: OLSON, SOLANO and FITZGERALD,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED January 12, 2017**

Appellant, Shaun C. Warrick, appeals from the judgment of sentence entered on August 20, 2015, as made final by the denial of Appellant's post-sentence motion on December 10, 2015. We affirm.

The trial court has ably summarized the underlying facts and procedural posture of this appeal. As the trial court explained:

> At trial, the Commonwealth presented the testimony of Philadelphia Police Detectives John Logan and James Burke, Philadelphia Police Officers Heather Andrews, Robert Flade, Jesus Cruz, and Robert Bakos, FBI Agent William Shute, Philadelphia Assistant Medical Examiner Dr. Edwin Lieberman, Alicia Watkins, Octavia Dugger, Kim Ivery, Lisa Williams, Kelly Hunt, Crystal Smith, and Kiana Walker. [Appellant] did not present any witnesses. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.
>
> On February 14, 2011, [Appellant], who had been arguing with his girlfriend, Tiffany Barnhill, recruited a friend, Alicia

---

* Former Justice specially assigned to the Superior Court.

Watkins, to go to Barnhill's residence and fight her. Watkins agreed to go with [Appellant], and recruited her friend, Octavia Dugger, to accompany them. [Appellant], Watkins, and Dugger then drove towards Barnhill's home in [Appellant's] car. While driving to Barnhill's home, [Appellant] made a series of phone calls to Mercedes Ivery, Barnhill's cousin, demanding to talk with Barnhill.

Upon arriving at Barnhill's home, . . . [Appellant] exited the vehicle and approached the door. [Appellant] kicked the door, breaking it open, and entered the house. Watkins and Dugger remained outside.

Shortly after [Appellant] entered the home, witnesses heard a series of gunshots coming from within the home. [Appellant] then ran out of the home, with Watkins and Dugger joining him as he returned to his car and drove away. As [Appellant] left the house, he placed something in the front of his pants. The day after the shooting, Watkins asked [Appellant] what happened inside the home and [Appellant] stated, "I fucked up." [Appellant] would later tell Watkins that he thought Watkins would "tell on him." [Appellant] also told Dugger not to "tell nobody about that day."

Minutes after the shooting, Mercedes Ivery's younger sister, Lexus, was walking home to the Rutland Street house when two neighbors, who had seen [Appellant] enter the home and heard the gunshots, called out to her. Lexus then called her mother, Kim Ivery, and told her about the gunshots in their home, which prompted Kim Ivery to call [the] police. No one other than [Appellant] was seen entering or exiting the home, either [30] minutes before the shooting or after the shooting, before police arrived on scene.

When the police arrived, they immediately noticed the broken door and proceeded into the home. Upon entering the home and going upstairs, police found [Tiffany] Barnhill and [Mercedes] Ivery in the upstairs bedrooms, with multiple gunshot wounds. Both women were dead. Police did not find anyone else in the home.

- 2 -

Ivery was shot a total of seven times: once in her face, once to the back left side of her head, twice in the left side of her chest, once in her right buttock, once in her left thigh and hip, and once in her right wrist. The shot to Ivery's head penetrated her skull and brain. One of the gunshot wounds to her chest penetrated her left lung and heart. Barnhill was shot a total of five times: once in her left shoulder and neck, once in her upper chest, near her armpit, which penetrated her left lung, once through the breast, which also penetrated her left lung, once on her side, which penetrated her diaphragm and liver, and once in her abdomen, penetrating her pancreas.

Police recovered a total of [14] .40 caliber fired cartridge casings from the [] house. Later examination would show that these fired cartridge casings were all fired from the same firearm. Police also recovered several projectiles, bullet jackets, and bullet jacket fragments, all of which were consistent with being fired from a .40 caliber firearm.

Police also conducted an analysis of the cell phone [Appellant] possessed on the day of the murders. Through cell phone tower analysis, the cell phone records showed that the possessor of that phone [traveled] to the area of the murders at the time of the shootings. The records also detailed a series of phone calls between that phone and [Mercedes Ivery's] cell phone throughout the early afternoon hours leading up to the time of the homicide. The phone also was used to make a series of phone calls to the home phone of the crime scene prior to the murders.

. . .

On August 19, 2015, following a capital jury trial before [the trial] court, [Appellant] was convicted of two counts of first degree murder [], one count of burglary [], one count of carrying a firearm without a license [], and one count of carrying a firearm on the streets of Philadelphia[.[1]]. Following a penalty phase hearing on August 20, 2015, [the trial court] imposed an aggregate sentence of two

---

[1] 18 Pa.C.S.A. §§ 2502, 3502, 6106, and 6108, respectively.

consecutive life sentences plus 16 to 32 [years'] incarceration. . . . [Appellant] filed [a timely] post-sentence motion[], which the [trial] court denied on December 10, 2015.

Trial Court Opinion, 3/17/16, at 1-4 (internal citations and footnote omitted).

Appellant filed a timely notice of appeal and now raises the following claims to this Court:

> [1.] Is [Appellant] entitled to an arrest of judgment on the charge of murder in the first degree, burglary and VUFA, § 6106 and § 6108 where the evidence is insufficient to sustain the verdict?

> [2.] Is [Appellant] entitled to a new trial on all charges where the greater weight of the evidence does not support the Commonwealth's verdict?

Appellant's Brief at 3.

We reviewed the briefs of the parties, the relevant law, the certified record, the notes of testimony, and the opinion of the able trial court judge, the Honorable Glenn B. Bronson. We conclude that there has been no error in this case and that Judge Bronson's opinion, entered on March 17, 2016, meticulously and accurately disposes of Appellant's issues on appeal. Therefore, we affirm on the basis of Judge Bronson's opinion and adopt it as our own. In any future filings with this or any other court addressing this ruling, the filing party shall attach a copy of the trial court opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/12/2017

Circulated 12/20/2016 12:54 PM

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

v.

SHAUN WARRICK

                OPINION

BRONSON, J.

:   CP-51-CR-0004005-2011
:   CP-51-CR-0004006-2011
:
:
:   CP-51-CR-0004005-2011 Comm. v. Warrick, Shaun C
:             Opinion
:
:
:

7421309751

March 17, 2016

On August 19, 2015, following a capital jury trial before this Court, defendant Shaun Warrick was convicted of two counts of first degree murder (18 Pa.C.S. § 2502), one count of burglary (18 Pa.C.S. § 3502), one count of carrying a firearm without a license (18 Pa.C.S. 6106), and one count of carrying a firearm on the streets of Philadelphia (18 Pa.C.S. 6108). Following a penalty phase hearing on August 20, 2015, the Court imposed an aggregate sentence of two consecutive life sentences plus 16 to 32 years incarceration in state prison (18 Pa.C.S. § 1102(a)(1); 42 Pa.C.S. § 9711). Defendant filed post-sentence motions, which the Court denied on December 10, 2015.

Defendant has now appealed from the judgment of sentence entered by the Court on the grounds that: 1) the evidence was insufficient to support the verdict on all charges; and 2) the verdict was against the weight of the evidence. Statement of Matters Complained of Pursuant to Rule of Appellate Procedure 1925(b) ("Statement of Errors") at ¶¶ 1-2. For the reasons set forth below, defendant's claims are without merit and the judgment of sentence should be affirmed.

# I. FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of Philadelphia Police Detectives John Logan and James Burke, Philadelphia Police Officers Heather Andrews, Robert Flade, Jesus Cruz, and Robert Bakos, FBI Agent William Shute, Philadelphia Assistant Medical Examiner Dr. Edwin Lieberman, Alicia Watkins, Octavia Dugger, Kim Ivery, Lisa Williams, Kelly Hunt, Crystal Smith, and Kiana Walker. Defendant did not present any witnesses. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

On February 14, 2011, defendant, who had been arguing with his girlfriend, Tiffany Barnhill, recruited a friend, Alicia Watkins, to go to Barnhill's residence and fight her. N.T. 8/13/15 at 93-96, 224, 227-229 288-290, 298-299. Watkins agreed to go with defendant, and recruited her friend, Octavia Dugger, to accompany them. N.T. 8/13/15 at 96, 174-175. Defendant, Watkins, and Dugger then drove towards Barnhill's home in defendant's car. N.T. 8/13/15 at 97, 174-175. While driving to Barnhill's home, defendant made a series of phone calls to Marcedes Ivery, Barnhill's cousin, demanding to talk with Barnhill. N.T. 8/13/15 at 98-99; 8/14/15 at 147-150.

Upon arriving at Barnhill's home, located on the 5400 block of Rutland Street, shortly after 3:30 p.m., defendant exited the vehicle and approached the door. N.T. 8/13/15 at 65, 87, 100-102, 174, 178-179; 8/14/15 at 28-29, 175, 181; 8/17/15 at 59. Defendant kicked the door, breaking it open, and entered the house. N.T. 8/13/15 at 100-101, 174, 178; 8/14/15 at 29-30, 175. Watkins and Dugger remained outside. N.T. 8/13/15 at 100; 8/14/15 at 28-29.

Shortly after defendant entered the home, witnesses heard a series of gunshots coming from within the home. N.T. 8/13/14 at 101-102, 30; 8/14/15 at 30-31, 56. Defendant then ran

out of the house, with Watkins and Dugger joining him as he returned to his car and drove away. N.T. 8/13/15 at 102, 179-180; 8/14/15 at 31, 177, 192-193. As defendant left the house, he placed something in the front of his pants. N.T. 8/14/15 at 31-33, 192-93. The day after the shooting, Watkins asked defendant what happened inside the home and defendant stated, "I fucked up." N.T. 8/13/15 at 103. Defendant would later tell Watkins that he thought Watkins would "tell on him." N.T. 8/13/15 at 104-105. Defendant also told Dugger not to "tell nobody about that day." N.T. 8/13/15 at 187.

Minutes after the shooting, Marcedes Ivery's younger sister, Lexus[1], was walking home to the Rutland Street house when two neighbors, who had seen defendant enter the home and heard the gunshots, called out to her. N.T. 8/14/15 at 35-36, 179. Lexus then called her mother, Kim Ivery, and told her about the gunshots in their home, which prompted Kim Ivery to call police. N.T. 8/13/15 at 234; 8/14/15 at 35, 179-180. No one other than defendant was seen entering or exiting the home, either thirty minutes before the shooting or after the shooting, before police arrived on scene. N.T. 8/14/15 at 34, 36.

When the police arrived, they immediately noticed the broken door and proceeded into the home. N.T. 8/13/15 at 60, 71-72. Upon entering the home and going upstairs, police found Barnhill and Ivery in the upstairs bedrooms, with multiple gunshot wounds. N.T. 8/13/15 at 60-62, 73-74; 8/17/15 at 19, 29. Both women were dead. N.T. 8/13/15 at 61-62. Police did not find anyone else in the home. N.T. 8/13/15 at 60, 63.

Ivery was shot a total of seven times: once in her face, once to the back left side of her head, twice in the left side of her chest, once in her right buttock, once in her left thigh and hip, and once in her right wrist. N.T. 8/17/15 at 20. The shot to Ivery's head penetrated her skull and brain. N.T. 8/17/15 at 23. One of the gunshot wounds to her chest penetrated her left lung and

---

[1] Lexus' last name was not given at trial.

3

heart. N.T. 8/17/15 at 25. Barnhill was shot a total of five times: once in her left shoulder and neck, once in her upper chest, near her armpit, which penetrated her left lung, once through the breast, which also penetrated her left lung, once on her side, which penetrated her diaphragm and liver, and once in her abdomen, penetrating her pancreas. N.T. 8/17/15 at 29-32.

Police recovered a total of fourteen .40 caliber fired cartridge casings from within the house. N.T. 8/14/15 at 79. Later examination would show that these fired cartridge casings were all fired from the same firearm. N.T. 8/14/15 at 231, 234-236, 242. Police also recovered several projectiles, bullet jackets, and bullet jacket fragments, all of which were consistent with being fired from a .40 caliber firearm. N.T. 8/14/15 at 232, 237-243.

Police also conducted an analysis of the cell phone defendant possessed on the day of the murders. N.T. 8/13/15 at 274, 279-281; 8/14/15 at 127. Through cell phone tower analysis, the cell phone records showed that the possessor of that phone travelled to the area of the murders at the time of the shootings. N.T. 8/14/15 at 141-143. The records also detailed a series of phone calls between that phone and Ivery's cell phone throughout the early afternoon hours leading up to the time of the homicide. N.T. 8/14/15 at 147-150. The phone also was used to make a series of phone calls to the home phone of the crime scene prior to the murders. N.T. 8/14/15 at 148-151.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Defendant first alleges that the evidence was legally insufficient as to all charges. As to the first degree murder charge, defendant specifically avers that the evidence did not establish that defendant acted with the specific intent to kill. As to all charges, defendant avers that the

4

verdict was "based on surmise and conjecture" because the evidence was "grossly unreliable." Statement of Errors at ¶ 1. These claims are without merit.

In considering a challenge to the sufficiency of the evidence, the Court must decide whether the evidence at trial, viewed in the light most favorable to the Commonwealth, together with all reasonable inferences therefrom, could enable the fact-finder to find every element of the crimes charged beyond a reasonable doubt. *Commonwealth v. Walsh*, 36 A.3d 613, 618 (Pa. Super. 2012) (quoting *Commonwealth v. Brumbraugh*, 932 A.2d 108, 109 (Pa. Super. 2007)). In making this assessment, a reviewing court may not weigh the evidence and substitute its own judgment for that of the fact-finder, who is free to believe all, part, or none of the evidence. *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011). "[A] mere conflict in the testimony of the witnesses does not render the evidence insufficient..." *Commonwealth v. Montini*, 712 A.2d 761, 767 (Pa. Super. 1998). The Commonwealth may satisfy its burden of proof entirely by circumstantial evidence. *Ramtahal*, 33 A.3d at 607. "If the record contains support for the verdict, it may not be disturbed." *Commonwealth v. Adams*, 882 A.2d 496, 499 (Pa. Super. 2005) (quoting *Commonwealth v. Burns*, 765 A.2d 1144, 1148 (Pa. Super. 2000), *app. denied*, 782 A.2d 542 (Pa. 2001)).

1. First Degree Murder of Tiffany Barnhill and Marcedes Ivery

"The evidence is sufficient to establish first-degree murder where the Commonwealth proves that (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with the specific intent to kill." *Commonwealth v. Edwards*, 903 A.2d 1139, 1146 (Pa. 2006) (quoting 18 Pa.C.S. § 2502(d)). The specific intent to kill can be inferred "from the manner in which the homicide was committed, such as, multiple gunshot wounds." *Commonwealth v. Hughes*, 865 A.2d 761, 793 (Pa. 2004). Moreover, specific intent

to kill may be inferred from a defendant's use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Robertson*, 874 A.2d 1200, 1207 (Pa. Super. 2005).

Here, there was clearly sufficient evidence for the jury to conclude that on February 14, 2011, defendant shot and killed both Barnhill and Ivery, with the intent to kill them. Alicia Watkins testified that defendant picked her and Octavia Dugger up and drove them to Rutland Street in order to have Watkins fight "some girls." N.T. 8/13/15 at 93-95. Watkins testified that, as they were driving, defendant was on the phone with an unknown woman, repeatedly asking the woman to "put Tiffany on the phone." N.T. 8/13/15 at 98-100, 130. Watkins further testified that, after arriving at the home, defendant exited the vehicle, went to the front door of the house, kicked the door in, and proceeded inside. N.T. 8/13/15 at 100-101. After defendant entered the home, Watkins testified that she and Dugger remained outside and heard gunshots from inside the house. N.T. 8/13/15 at 101-102. Watkins testified that she and Dugger then ran away from the house, with defendant running out of the house after them. N.T. 8/13/15 at 102. When Watkins later asked defendant about what happened inside the house, defendant told Watkins, "I fucked up." N.T. 8/13/15 at 103-104. Watkins also testified that defendant had expressed concern to her that he thought she was "going to tell on him." N.T. 8/13/15 at 104-105.

Dugger, defendant's other companion that day, substantiated Watkins testimony at trial, testifying that she had accompanied defendant and Watkins and that defendant had kicked down the door to the house. N.T. 8/13/15 at 174, 178-179. Dugger also stated that defendant had "told [her] more than once not to tell nobody about that day." N.T. 8/13/15 at 187.

The records of the cell phone that defendant possessed on the day of the murder offered compelling corroboration to the testimony of Watkins and Dugger. While the cell phone that defendant possessed was registered under the name of Alan Martin, Lisa Williams, the aunt of

Tiffany Barnhill, testified that Barnhill gave her that cell phone number to reach defendant on the day of the murders. N.T. 8/13/15 at 274; 8/14/15 at 155. Kelly Hunt, Barnhill's sister, similarly testified that on the day of the murders, defendant called her from that same cell phone number. N.T. 8/13/15 at 279-281. Analysis of this cell phone revealed that defendant made a series of calls to Ivery's cell phone in the hours and minutes prior to the murder, corroborating Watkin's testimony that defendant made repeated calls in an attempt to speak with Barnhill, who was staying with Ivery. N.T. 8/14/15 at 147-150. These records also revealed that near the time of the murders, the cell phone possessed by defendant was located in a cell tower coverage area that included the location of the murders. N.T. 8/14/15 at 141-143, 148-151.

Defendant's presence at the scene, and entry into the house, was also corroborated by the eyewitness testimony of Crystal Smith, who was on the street across from the location of the murders at the time of the murders. Smith testified that she was talking with a friend when defendant and two women arrived at the house where the murders occurred. N.T. 8/14/15 at 28-29. Smith testified that she witnessed defendant run up the steps of the house and kick the door down. N.T. 8/14/15 at 29. Smith testified that, almost immediately after defendant entered the home, she heard a series of gunshots coming from inside the house. N.T. 8/14/15 at 29-31, 56. Smith further testified that she watched defendant exit the house, and that defendant was making gestures towards the front of his pants, pulling them forward with one hand while motioning down the waistband with the other. N.T. 8/14/15 at 31-33. Smith further testified that she did not see anyone enter the house for at least thirty minutes prior to the murder and did not see anyone enter or leave the house after defendant left before police arrived at the scene. N.T. 8/14/15 at 34, 36. Smith's account was corroborated by Kiana Walker, the friend with whom Smith was talking. N.T. 8/14/15 at 181, 191-193.

7

Philadelphia Police Officer Heather Andrews, one of the first police officers at the scene of the murder, testified that she received a radio call for a report of a shooting and arrived at the scene of the report within a few minutes. N.T. 8/13/15 at 57-58. Officer Andrews testified that the front door of the Rutland home had been kicked in. N.T. 8/13/15 at 60. Officer Andrews also testified that she and her partner entered the property, verified that no one was present on the first floor of the home, and then proceeded upstairs to the second floor. N.T. 8/13/15 at 60-61. Upon reaching the second floor, Officer Andrews testified that she saw Barnhill and Ivery, clearly deceased, both having suffered recent gunshot wounds. N.T. 8/13/15 at 61-63. After additional police officers arrived, Officer Andrews testified that she checked the remainder of the second floor and verified that no one was present in the house aside from the two victims. N.T. 8/13/15 at 63. Police Officer Robert Flade would later testify that, aside from the front door leading into the house, there was an additional exit to the street from a door in the basement, but that the basement door was blocked by items that did not appear to have been moved recently. N.T. 8/17/15 at 52-56.

In addition to the facts set forth above, the Commonwealth also introduced evidence of defendant's consciousness of guilt. Watkins testified that she asked defendant about what happened inside the house and that defendant said, "I fucked up." N.T. 8/13/15 at 103-104. Watkins also testified that defendant had expressed his concern to her that he thought she was "going to tell on him." N.T. 8/13/15 at 104-105. Dugger's stated that defendant told her "more than once not to tell nobody about that day." N.T. 8/13/15 at 187. Finally, Philadelphia Police Detective James Burke testified that, when he went to arrest defendant for the murders of Barnhill and Ivery, that defendant refused to answer the door and ran up the steps after police entered, requiring police to chase him upstairs. N.T. 8/17/15 at 72.

8

Dr. Edwin Lieberman testified that both Barnhill and Ivery suffered multiple gunshot wounds, which resulted in their deaths. N.T. 8/17/15 at 19, 29. Dr. Lieberman testified that Barnhill was shot a total of five times, through her shoulder, chest, and abdomen, the combination of which was ultimately fatal. N.T. 8/17/15 at 29-32. Regarding Ivery, Dr. Lieberman testified that she was shot a total of seven times, through her head, chest, abdomen, buttock, thigh, and wrist. N.T. 8/17/15 at 23-27. Dr. Lieberman also testified that Ivery's head wound and chest wound were both independently fatal. N.T. 8/17/15 at 24-25.

Ballistics evidence recovered at the scene were consistent with a .40 caliber Glock/sigma type semiautomatic firearm. N.T. 8/14/15 at 79, 231, 234-236. Later comparison confirmed that each fired cartridge case was fired from the same firearm. N.T. 8/14/15 at 242. In addition, examination of all projectiles recovered were consistent with being fired from the same firearm. N.T. 8/14/15 at 242-243.

The above evidence clearly demonstrated that defendant kicked open the door of the Rutland Street house, entered the home, and then shot Barnhill and Ivery repeatedly with a .40 caliber Glock style semi-automatic firearm. Defendant's intent to kill may clearly be inferred from the repeated use of a firearm on vital parts of both Barnhill and Ivery's bodies. No relief is due.

2. Burglary

A person commits the offense of burglary "if, with the intent to commit a crime therein, the person...enters a building or occupied structure, or separately secured or occupied portion thereof that is adapted for overnight accommodations in which at the time of the offense any person is present...." 18 Pa.C.S. § 3502(a). The intent to commit a crime in the premises may be inferred from the totality of circumstances, and may be inferred from defendant's actions and

9

words, which "bear a reasonable relation to the commission of a crime." *Commonwealth v. Alston*, 651 A.2d 1092, 1094 (Pa. 1994).

Here, the evidence stated above clearly established that defendant kicked open the door of the Rutland Street home in which Kim Ivery, her two daughters, her boyfriend, and Barnhill all regularly resided. N.T. 8/13/15 at 225. The home was also occupied at the time of defendant's entry by Barnhill and Ivery. Defendant's intent to commit a crime upon entry is demonstrated by defendant's killing of Barnhill and Ivery, detailed above, after violently kicking in the door. N.T. 8/13/15 at 94-95. No relief is due.

### 3. Possession of a Firearm Without a License

A person violates section 6106 of the Uniform Firearms Act if he "carries a firearm in any vehicle or...carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license...." 18 Pa.C.S. § 6106(a)(1). "Firearm" is defined by section 6102 to include "[a]ny pistol or revolver with a barrel length less than 15 inches...." 18 Pa. C.S. § 6102. In order to fall under the purview of section 6106, the object must also either be operable or the defendant must have under his control the means to make the object operable. *See Commonwealth v. Gainer*, 7 A.3d 291, 296 (Pa. Super. 2010), *appeal denied*, 23 A.3d 1055 (Pa. 2011).

The evidence stated above clearly showed that defendant was in possession of an operable firearm when he shot and killed both Barnhill and Ivery. Crystal Smith testified that defendant concealed something in his pants, after exiting the Rutland Street home and after she heard gunshots coming from the home. N.T. 8/14/15 at 30-34. Similarly, Kiana Walker also testified that she told police she saw defendant place an unknown object in his pants upon exiting the building. N.T. 8/14/15 at 192-193. Additionally, defendant both arrived at the scene and

10

fled the scene in his vehicle. N.T. 8/13/15 at 97, 102, 174-175. The Commonwealth also presented evidence, in the form of a certificate of non-licensure, that defendant did not have a valid license to carry a firearm in Pennsylvania. N.T. 8/17/15 at 69. Accordingly, there was sufficient evidence for the jury to conclude that defendant possessed a firearm when he shot and killed Barnhill and Ivery, that he concealed this weapon on his person upon exiting the Rutland home, that he transported this firearm in his vehicle both to and from the scene, and that he did not possess a license to carry this firearm.

4. Possession of a Firearm on the Streets of Philadelphia

A person violates section 6108 of the Uniform Firearms Act if he "carry[s] a firearm, rifle or shotgun at any time upon the public streets or upon any public property in [Philadelphia]." 18 Pa.C.S. § 6108. "Firearm" is defined by section 6102 to include "[a]ny pistol or revolver with a barrel length less than 15 inches...." 18 Pa. C.S. § 6102. As described in the above sections, there was sufficient evidence for the jury to find that defendant possessed a firearm on the public streets of Philadelphia before entering, and after leaving, the Rutland Street home.

B. *Weight of the Evidence*

Defendant next claims that "the verdict is against the weight of the evidence" as to all charges. Statement of Errors at ¶ 2. This claim is without merit.

In considering a challenge to the sufficiency of the evidence, the Court must decide whether the evidence at trial, viewed in the light most favorable to the Commonwealth, together with all reasonable inferences therefrom, could enable the factfinder to find every element of the crimes charged beyond a reasonable doubt. *Commonwealth v. Walsh*, 36 A.3d 613, 618 (Pa. Super. 2012) (quoting *Commonwealth v. Brumbraugh*, 932 A.2d 108, 109 (Pa. Super. 2007)). In making this assessment, a reviewing court may not weigh the evidence and substitute its own

11

judgment for that of the factfinder, who is free to believe all, part, or none of the evidence. *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011). "[A] mere conflict in the testimony of the witnesses does not render the evidence insufficient..." *Commonwealth v. Montini*, 712 A.2d 761, 767 (Pa. Super. 1998). The Commonwealth may satisfy its burden of proof entirely by circumstantial evidence. *Ramtahal*, 33 A.3d at 607. "If the record contains support for the verdict, it may not be disturbed." *Commonwealth v. Adams*, 882 A.2d 496, 499 (Pa. Super. 2005) (quoting *Commonwealth v. Burns*, 765 A.2d 1144, 1148 (Pa. Super. 2000), *appeal denied*, 782 A.2d 542 (Pa. 2001)).

The evidence outlined above plainly established that defendant committed the crimes of which he was convicted. Because the evidence fully supported the verdict, the Court did not abuse its discretion in denying defendant's motion for a new trial.

### III. CONCLUSION

For all of the foregoing reasons, the Court's judgment of sentence should be affirmed.

BY THE COURT:

GLENN B. BRONSON, J.